Make it clear to the law school, unless you're the dean back there, but as far as we're concerned, you can come in, you can leave when you want to, you can come in when you want to, so there's no protocol about that. Well, if you're at council table, you probably ought to stay for the whole argument. Thank you. Okay, we'll call the next case, and that's Alexander v. Ameripro and Wells Fargo and so on. And Mr. Maude will hear from you, representing Tina Alexander. Yes, Your Honor. Joe Ahmed on behalf of the appellants. May it please the court, we are here in this case under the Equal Credit Opportunity Act, because we believe that we've far exceeded the Rule 8 pleading requirement, as interpreted by the Supreme Court in Twombly, Iqbal, and Swierkiewicz v. Sarema, and as that standard has been interpreted by this court. And as the Supreme Court made clear in Swierkiewicz, the issue here on a motion to dismiss is not whether the plaintiff will ultimately prevail, although we think under the pleadings it's clear that we should, but whether the claimant is entitled to offer evidence to support the claims. Or, as the court in Twombly said, our pleading just needs to raise a reasonable expectation that discovery will reveal evidence. And in a minimum, we did that. And I think that the pleadings have to be considered in the context of the statutory requirements. Well, I think, to me, maybe the better test is do you state a plausible claim? And I suppose Judge Werlein felt that you didn't present sufficient direct evidence, and you didn't present sufficient pleadings under the McDonnell-Douglas statement to show that you presented a plausible claim. And this was your third amended complaint. Now, is this the fourth complaint in all, or is this a fifth complaint? You filed one in state court. Yes. And then you were removed to federal court. And is that when you started filing your amended complaints? I think that's correct. I think we did a first amended, which would have been the second complaint. Right. And a second amended, a third complaint, and a third amendment. So you filed four complaints. And I note that in his opinion, he ruled that you were not going to be allowed to amend again, and you don't raise that as an issue on appeal. So you're going to live or die by the third amended complaint. Yes. At this stage, Your Honor, without any other discovery, we pled everything we could. And here's what we pled, because I do agree. The standard is, under Iqbal Twombly, plausibility. And we pled that, number one, we applied for loans. Number two, we were on government assistance. Now, everyone applied for a loan? Yes. All 12 plaintiffs applied? All 12 plaintiffs applied for loans. They filled out a loan application. They filled out a loan application. And you state that in your complaint. Yes, Your Honor. In fact, I think it's in paragraph 40. We state that they were all applicants. Where do we get the information that there were several of the plaintiffs who did not actually apply? Well, it's not clear, because several of the plaintiffs, for example, I know of at least six, for example, that actually received loans but without their public assistance being considered from one of the two defendants. And so it's not always clear, because sometimes what I hear one appellee saying, for example, Wells Fargo will say, well, you got your loan through Ameripro through another lender, so you weren't an applicant to us. Or, for example, Zachary Taylor, I'm sorry, not the President, Zachary Baylor applied. Now, what about the people who didn't apply because they were discouraged from applying, because they were said, don't indicate that you're getting public assistance, because that will be a negative as far as the loan approval itself is concerned. And they didn't apply based on the advice of the lender. Well, I think all of them. Were there some of those? The most among the 12? Well, I think there were some people that were discouraged, but I think all of them ultimately applied for some type of loan. And let me just take a step back and see if I can clear up maybe some of the confusion. Some of them would have called up, for example, and asked about credit. That's how they would typically start off. They would call a lender and ask about credit. Wait, is this what you state in your complaint? I've read your complaint. Well, I'm just giving the background. Well, no, we don't want your background. We want to know exactly what you pled in your complaint. I pled that they all applied for loans. And just so we're clear, the discouragement claim was not specifically pled. I don't think it needs to be pled because it's just a type of discrimination. We alleged, not that we were discouraged from ever applying, but that we actually applied and didn't get the Section 8 housing considered. We didn't get the public assistance considered. And so when it comes to discouragement, for example, some people might ask about Section 8, say they're on Section 8, but we told they could not include that in their application. So they did apply. Every single one of them did apply. It is more than plausible when you apply for a loan, and we allege that they all applied. We allege that they were all on public assistance. So what you're saying, then, is that they applied for a loan, but several of them did not refer to their being on public assistance in the application. In the application, in the written application, I believe some of them did not, and I believe some of them did but still did not get it considered. I believe that is correct. Now, I say this, and here's one of the disadvantages that I have. And I'm sorry, I didn't know. No, you go ahead. I'll follow up. We haven't done any discovery as a whole in this case. We were allowed a deposition in state court under Rule 202, state procedure. A little bit of an unusual procedure where you get to typically take a deposition to investigate claims. This is at the discretion of the court. Our deposition, I think we were limited to maybe an hour or two, and only with respect to one of the plaintiffs. And you're not allowed a corporate rep deposition. You're not allowed to ask overarching questions. And we did that. So it's not a coincidence that our most specific allegations concern the one deposition that we did get that lasted all of about 79 pages. That was Tina Alexander. So I believe that they all, well, I know that they all applied, and I believe some of them had it in writing in their applications and some of them did not. Now, we have documents with respect to one person, Tina Alexander. We don't have a single document with respect to any of the others. They have that information. And because we haven't gotten to the discovery stage, it is very difficult to plead things we don't know about that could be in the file. But you did plead it? Yes. We absolutely did plead that they were applicants. And that is in, I believe it's in paragraph 40 with respect to all of them. But I think it's actually specified with respect to other individual defendants later on. For example, in paragraph 84, I know we go continuously through the situation of Tina Alexander. And I believe in allegation paragraph 95, we go through the allegations that pertain to Zachary Baylor. In fact, I think we gave Zachary Baylor's actual down payment assistance and section 8 assistance of $500 a month, and they were just locked off and not considered as part of his loan. And I think common sense gets you. Judge Worline, in his opinion, at the very start, questions why all of these 12 plaintiffs are in the same action. He says there may be a joinder problem, a severance problem under Rules 20 or 21. I'm not sure how that would have bearing on his Rule 12b6 dismissal that we're considering. But why are all of these 12 plaintiffs in one complaint when we have so many different facts? Because I think they're all subject to the same policy, which we have specifically pled, we've specifically cited, we've quoted the policy in paragraph 79 of our complaint. Now, whether it is a joinder problem or not, I will leave to the discretion of the district court, of course. But we pled them all that way because they were all subject to the same policy in our judgment. And in any event, it is more than plausible, given the policy that applies in this correspondence lending situation, that when the applicants, the appellants here, did not have their Section 8 considered, it was because of the policy that they were filling. In fact, they were told that. As far as whether it's plausible or not, it seems to me Judge Worline was relying on something you very much dispute in your briefing, and that's the prima facie case and whether you had to allege all the elements of it. And he, you know the language of his opinion, he points out two elements of the prima facie case that are not alleged in the complaint. You cite some authority that really is distinguishing a prima facie case from a direct evidence case. What is your best case? I mean, there's a recent case from us, Raj, R-A-J, where Judge Higginson said you don't have to prove the entire back-and-forth prima facie, substantial reason pretext, but it certainly implies that the elements of the prima facie case are necessary to make a plausible claim. What's your best case that it's not necessary to prove the elements of the first factors that make up the prima facie part of McDonnell Douglas? Swerkovich, I think, versus Serena out of the Supreme Court is the best case. And I'll quote the case because it's very important what it says. It says, before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formula of the required prima facie case in a particular case. Given that the prima facie case operates as a flexible... Hold on just a minute. I want to give each side two more minutes, so go ahead. Thank you, Your Honor. Given that the prima facie case operates as a flexible evidentiary standard, it should not be transposed into a rigid pleading standard for discrimination cases. Now, by the way, this is a continuation of the Supreme Court's teaching all the way back to 1983 in United Postal Service v. Aikens, going up through Reeves, going up to Desert Palace, and in Serena. They have said the same thing repeatedly, that the McDonnell Douglas test is not a rigid test, and the prima facie test is supposed to be a flexible one. And we don't really care whether you call it direct evidence or circumstantial evidence. The real issue is, do you have enough evidence? Nobody really cares what the Supreme Court has taught. They don't really care what it's called. That's not in the statute. And particularly here when we're talking about mortgage discrimination cases and we're talking about law that's being applied from employment discrimination, it's really hard to fit it and pigeonhole it into that test, especially if it's rigidly applied as we contend it was here. But, I mean, why wouldn't the argument be that the question here is under Iqbal. I mean, it's plausibility and not McDonnell Douglas or any other standard by which you've got to make it. I agree completely. And I would say, how is it not plausible that when somebody goes through the loan process, applies for a loan, is on Section 8, has it denied, is told it's denied because they don't take Section 8. I see a policy that confirms what the person testified to in the deposition, that they do not take Section 8. I think that's a little bit more than actually plausible. I think that's the whole case. And so right now, I think even with what we've got, it's a pretty solid case. I think I've proven more than you would need on summary judgment even or to prevail at trial. Okay. You've saved some time for rebuttal, Mr. Mullen. Thank you. We'll hear from Mr. McRae Worrell. May it please the Court. Thomas McRae Worrell for the Consumer Financial Protection Bureau. Your Honor, on this question of the application of the You're going to need to slow down a little bit. Sure. Your Honor, on the question of the application of the prima facie case standard, Cerkovic is actually very clear on this question. The application of the McDonnell Douglas framework on a motion to dismiss is clear error. And this Court has recognized that holding as controlling authority in this circuit. In the Raj case that Judge Southwick referred to, and if I may, it's very clear from the opinion, page 331 of the opinion, a plaintiff need not make out a prima facie case of discrimination in order to survive a Rule 12b6 motion to dismiss, citing Cerkovic. The district court erred by improperly substituting an evidentiary standard for a pleading requirement. That's the central holding of Cerkovic. And Cerkovic was about a prima facie case. But if you look at, I think it's page 11 to 512 of Justice Thomas' unanimous opinion for the Court, he also talks about direct evidence and says, look, direct evidence is another way that a plaintiff can prove a claim of discrimination. So the holding of Cerkovic is about taking these evidentiary standards and improperly transplanting them into the motion to dismiss stage. That's simply clear error. The hurdle that plaintiffs had to cross here is the familiar plausibility standard under Iqbal and Twombly, and we think that they did certainly meet that standard. But coming from the Bureau, I wanted to stress that we think that there are some Well, that was my immediate reaction to the way you've begun your argument. You're like you're here as a co-counsel for plaintiff instead of an amicus. Well, Your Honor, because No, we look for you to help us on understanding the regulations and the statutes and all. I don't believe you're here as an amicus to argue the case for plaintiff in that sense. Well, Your Honor, actually Iqbal and Twombly go to what would make a plausible ACOA claim, and we think that the district court here, that the errors around these evidentiary standards are actually related to its misinterpretations of ACOA and Regulation B. For instance, the district court concluded that in order to state a claim of discrimination under ACOA, a plaintiff must plead a hostile statement. There is no such requirement under ACOA, and that's inconsistent with holdings of this court and of the Supreme Court. Particularly for this court, it's the Moore v. Department of Agriculture case, but I think in my limited time, I think the most important case here would be the Johnson Controls case out of the Supreme Court, where there were no hostile statements because the defendant in that case was actually the discriminatory policy in that case was motivated by ostensibly benevolent reasons. The employer there wanted to protect its workers, so there was no kind of hostile statement. Nevertheless, the court here said, well, you've got a facially discriminatory policy, but you still have to have hostile statements. Well, there's a case law that refers to a defendant showing hostility towards whatever the particular area of discrimination may be. I'm not sure how Judge Werlein meant it, but it seems to me that phrase could be taken too literally. I mean, that is what you're saying, that these particular defendants, Wells Fargo and Maripro, were hostile through their actions without statements of hostility. I wonder if you're not over-reading Judge Werlein's use of the word hostility. Well, Your Honor, one way of construing these policies is as facially hostile. That would be certainly one way. I mean, particularly if you look at the Moore case I just referred to and it's referred to throughout the briefing, the no-whites policy could be construed as a hostile statement or as motivated by some sort of hostility. But typically, where you have a government actor or a corporate actor, the question of, in a policy context, the notion of hostile statements or animus sometimes doesn't apply as well, as opposed to cases where you, say, have discrimination in employment where you have a possibly innocent explanation. There you are looking for hostile statements that would show that innocent explanation to be mere pretense. And also, Your Honor, I want to point out the way in which the court failed to look at the limited purposes for which public assistance income can be looked at by a creditor under the statute. 1691b.2 lays those out. There are three circumstances, and the court notes those in a parenthetical but then gives them no real effect and simply says, well, public assistance income can be looked at as a relevant factor. That's a plain misreading of ACOA. It's a misreading also of Regulation B, where Regulation B goes into detail about under what circumstances a creditor can look at public assistance income. There are things like the length of time that the income will continue, whether or not a dependent will continue to qualify for income, and whether or not the income can be garnished or attached. But what is a categorical violation under Regulation B, and this is 6b.5 and its accompanying interpretations, is the categorical exclusion of that income. And I should note as a footnote, Your Honor, if I may, Wells Fargo says that those interpretations are not entitled to deference. Those interpretations went through notice and comment rulemaking beginning in 1985 and are entitled to full Chevron deference by this court. Okay. Thank you. Thank you, Mr. McRae-Warrell. Mr. McKenna, we'll hear from you next. Thank you, Judge Gellar. May it please the Court. My name is Dan McKenna, and I represent one of the appellees, Ameripro. I'd like to address two things if I can. First, how, if at all, Swerkowitz applies to ACOA claims. And second, the impact of plaintiffs' waiver of the direct evidence issue. But before I do that, I want to touch on something that you raised, Judge Barksdale, which is the lack of plaintiffs to establish standing. I don't think there's a person who's read this complaint more than me. And I will tell you that they do not allege, with respect to six plaintiffs, and those plaintiffs are Alexis, Baines, Bennings, Haygood, Henry, and Rosalynn Jones, that they ever applied for loans. Now, the paragraph that plaintiffs' counsel or appellants' counsel refers to is paragraph 40. And what they allege there is that they were applicants seeking credit. And this is a legal conclusion under the statute. That's not a factual allegation. Let me suggest or explain to you why that's so important. So that is the sole basis of that argument that everybody applied? Exactly, Your Honor. And in fact, what is it cited again? Pardon me, Judge? Cited again. Oh, that's in paragraph 40, Your Honor. Okay. The one thing you need to say about these microphones because we lose your argument. Forgive me, Your Honor. In paragraph 40, they make the legal conclusion that they're applicants under ECOA. But if you look at the rest of the complaint, the only thing those six people say is that they contacted Ameripro and inquired into financing. And that matters, Your Honors, because ECOA defines the term inquiry as something different than application. Now, plaintiffs brought their claim under 1691E, which provides standing only for an aggrieved applicant. And ECOA defines an applicant as a person who applies for credit. Now, we filed two motions. Or says some reg that there is a regulation, as I recall, that makes that a little more iffy. Regulation B, but that's not a matter. Right. And there's also the regulation B also defines the inquiry point, which is critically important because that's what they allege specifically they did. And that's not an actionable thing, responding to an inquiry as to what someone could be eligible for. Well, but my point is that was not the basis on which Judge Werlein dismissed the complaint, was it? No, it's not, Your Honor. So you want us to take it up for the first time on appeal? Well, Judge, it's an issue of standing, and it's an issue that was raised below, and this court obviously is allowed to affirm for any reason. And if it's defined that the plaintiffs failed to establish standing, that's a basis for affirming the dismissal of their claims. And if I can quickly just point out that we filed a motion for a more definite statement two times and raised this issue. We filed a motion to dismiss once and raised this issue, resulting in the operative complaint, and they still didn't allege it. They clearly know how to allege people applied because they do for the other four with respect to Ameripro. But they didn't allege those six folks applied, and I'm reminded of the Puente decision, and I may be mispronouncing it, but it's a decision of this court, a discrimination case. And this court said that equally as important as what was pled is what was not pled. And if there is a fact within the control of the plaintiff that is so core to their claim that they should be screaming it from the courthouse roof, it's fair to assume that that fact doesn't exist. And I can't imagine a more applicable situation than this where they've had four chances and have been reminded multiple times, and they didn't do it. But that's only with respect to certain plaintiffs. That's the six I mentioned, Your Honor. Now, what's interesting about the other four is the other four seem to expressly allege, and counsel just conceded to the court, that they didn't even include their Section 8 income on their applications. Now, if you look at paragraph 83, they use a very creative language in their complaint, and they say that their Section 8 income was not included for consideration. But they're still applicants. They did apply, Your Honor, but if they didn't include the income, how could we not consider it? We can't consider something that's not. That's another reason for dismissal, apart from the lack of an application. Absolutely, Your Honor. And since I only have a few minutes, let me jump into the reasons that the court did dismiss the case, if I may. We'll give you time to make your arguments. I appreciate that, Your Honor. So plaintiffs and the CFPB argue that SWCCRTs should apply to ECOA cases. Accepting that argument, every time this court has applied SWCCRTs, or frankly, any court post-Iqbal and Twombly has applied SWCCRTs, never once in any of the cases I have seen has a court not looked at the elements of McDonnell Douglas or direct evidence for determining plausibility. Okay? This court in Raj, which is a controlling decision, and everyone cites to it for their propositions, the Raj court did say, look, you don't have to prove a prima facie case at the pleading stage. But then it went and looked at the McDonnell Douglas elements and said the plaintiff failed to state a plausible cause of action because they hadn't identified other individuals who were similarly situated but not protected that got treated differently. That's what this court held, and Your Honor, Judge Jolly, you were on that panel in the Raj decision. That's exactly what the district court said. The district court said plaintiffs failed to allege that other similarly situated, non-protected individuals were treated differently. That's what the district court held. Now, I can see the district court held that's a prima facie element and a prima facie issue. But the holding and the outcome is the same. And if you think about it, that is the foundation of discrimination. There must be a contention, an argument, an allegation in the complaint that someone is being treated differently, notwithstanding the fact that they're similarly situated, just because they're not from a protected class. That's what this court held in Raj. That's what the First Circuit held in Rodriguez when you look at post-Swickard's cases assigning Swickards. Yeah, but what he said is that it's clear that you can prove discrimination either under McDonnell-Douglas, which is circumstantial evidence, or you can prove it directly. And they are arguing that they have proof of direct discrimination and consequently they don't need to refer to McDonnell-Douglas. So you're right, Your Honor. And in the Moore case, this court held that if you have direct evidence of discrimination, no whites, then maybe you don't have to show that other people are being treated differently. Because that's the comparative fact, if I will. The comparative allegation that clearly other people are being treated differently. And what do they point to, Your Honor? They point to this alleged Wells Fargo policy. Now let me point out first that the six plaintiffs I identified earlier, Alexis, Baines, Bennings, Haygood, Henry, and Rosalyn Jones, they don't allege the Wells Fargo policy was applied to them. Now counsel stood up here today and told you they do allege that. Yeah, I understand that. But the Wells Fargo policy is quite different from, as I understand, Amerigo's problem. And that is that you have direct application. You have applicants with respect to the Amerigos, at least some of them. Right. And with respect to, I think maybe there are two in Wells Fargo that were actual applicants. And then others arrested. And maybe all of the plaintiffs are relying upon this policy of Wells Fargo to state a claim against it. I think that's what counsel has told you today. And let me tell you that— I didn't understand that there were—go ahead. I might have misunderstood him, Your Honor. But my understanding from counsel today was that they're claiming that policy undergirds all of these claims and is the underlying component of all of these claims. And core to a discrimination case is the allegation that people are being treated differently. Right. The district court said there is no allegation in the complaint that people are being treated differently. Plaintiffs have not challenged that. CFPB hasn't challenged that. Then the district court said—and the direct evidence. There were two allegations of direct evidence. One was that the Ameripro was not considering their income. The court held that was too conclusory. That was not a sufficiently pled. There were no factual support. Unlike Kendra Williams, who is the plaintiff who hasn't appealed this case, who has 11 paragraphs of factual allegations. Unlike some of the other plaintiffs who tried to make out when they applied what they were told. Those folks purport to identify six claims over the course of three years in a single paragraph that says, we were all told the same exact thing. And the court said that's too conclusory. Now, plaintiffs don't appeal that. That issue is not in their briefs. That issue has not been argued by them. They have waived that issue. Wait, what issue? Say it again. The issue that the district court held that the allegation that Ameripro told them it didn't have an investor to buy their loan was direct evidence. That's one of the arguments they made below. And the district court held that allegation was too conclusory. Nowhere in their briefs do plaintiffs argue that. Instead, they keep focusing on this Wells Fargo policy, which doesn't apply to the six people I just mentioned. It applies to four, at least according to their allegations. And that policy, though, however, isn't direct evidence of discrimination because it doesn't have the animus. And Judge Southwick, you caught on to this, I think. I think they overread the concept of animus. I think what the judge meant below and what the courts have identified of the concept of animus is that the statement itself has to establish the discriminatory intent. No whites. Clearly establishes discriminatory intent. The fact that or the allegation that there's a policy that someone might not buy a loan down the line does not evidence the discriminatory intent because it doesn't explain in and of itself how that impacts the consumer. Well, I mean, I understood the complaints maybe differently from the way you were looking at it. I mean, you had one set against Ameripro and you had another set really against Wells Fargo. And the Wells Fargo, at least in two or three of the instances, it was because Wells Fargo was a creditor. And it was not a creditor in some of those instances because it didn't participate in the loan itself and didn't meet the definition of a creditor. In two of them, I think, they had direct applicants and they addressed direct applications and they were participating in the denial of credit with respect to two of them according to the allegations of the complaint. Then with respect to Amerigo, I mean, they had a number of plaintiffs, some of whom had not applied, but some who had directly applied with Amerigo and were denied the loan on the basis of the fact that they were entitled and would not process Section 8 vouchers. If I may, Your Honor. So the two plaintiffs, do I have two more minutes or is this included? No, go ahead. Go ahead. We'll give each side two more minutes. I appreciate that, Judge. I won't throw an argument on the case because it is a little fussy. So the two plaintiffs who directly applied to Wells Fargo, if I may defer to Tom Luce, who represents Wells Fargo, to answer that issue. The other ten applicants, six of them, well, I'm sorry, the other ten appellants, six of them don't allege they applied, and I addressed that. The other four allege that they applied to Ameripro, but didn't include their Section 8 income on their applications. Now those folks say Wells Fargo's policies applied to Ameripro's underwriting. Okay, so you're telling us then there was no single applicant that alleged a denial on the basis of Section 8. Correct, Your Honor. Not a single applicant says the reason I didn't get this loan was Section 8, that they refused to process a Section 8 voucher. Well, Judge, they all say that, right? But they don't allege the facts to get you there. So for six, they say they didn't get a loan because they wouldn't consider Section 8 income, but they don't allege they ever actually applied for the loan. For the other four, they allege I couldn't get the loan I wanted because they wouldn't consider Section 8 income, but I didn't submit my Section 8 income in my application, and they claim that they didn't do it because we told them not to. That's what they claim for those four. Wait, I mean, is there a single applicant? I would submit no, Your Honor. Is there a single applicant who filed a full form alleging their Section 8 income who was denied the loan? I would submit no, Your Honor. It's certainly not alleged in the complaint. Well, if I'm a plaintiff and I've stayed in a complaint, I did not submit my Section 8 income because Ameripro told me not to. What more am I required to do in a complaint? So, Your Honor, the issue becomes you have to—it boils down to, if you were to ask me what's the one missing thing in this complaint, it's the comparative fact, right? And what those four people don't allege is that someone else was treated differently because their income was included. And what they don't allege is that there exists actually a policy saying— I'm not so sure. They're going by the language of the statute. You shall not discriminate against someone because they get Section 8 income in making a loan. Well, I would submit, Your Honor, that they have to include that income in the application for that to be the case. I mean, it's like you're saying that if I want to say I was just not allowed to enter a restaurant because I was from Mexico, that I've got to say, but they allowed people from America to enter the restaurant. I mean, I just don't follow your logic on that. So, Your Honor, if I— You're making filing a complaint mighty difficult, which is supposed to be a plain statement of the claim. I appreciate that, Judge, but let me explain what this Court has held. It's held that you can allege and establish that comparative fact two ways. One, you can allege that there are similarly situated, non-protected individuals who were treated differently. That's what this Court held was missing in Raj and dismissed because it didn't have the comparative fact. What was the statute at issue in Raj? It was an employment discrimination case, Your Honor. Right, employment discrimination. Sure. Not this particular statute, this Equal Credit Opportunity Act. You're right, Your Honor, except plaintiffs are asking the Court to apply employment discrimination law to the Equal Credit Opportunity Act. Well, it uses the word discrimination. Sure. Well, the other component of it, Judge, and what this Court did more, is it's allowed folks to avoid that factual pleading when it's identified a policy that's discriminatory on its face, that has the animus, that shows by its statement that it's prejudicial or discriminatory. You may be applying too much of the pleadings. Okay. We will now hear from you, Mr. Lease. Thank you, Your Honor. Thank you. Forgive me, Judge. Is this your water? I hope it's mine. Well, I drank from it, so I apologize. Not a problem. There's no objection. He's going to turn to the dark side. What did you put in it? May it please the Court, my name is Tom Lease. I represent the other appellee in this case, Wells Fargo. I'd like to follow up, I think, on some comments that you made, Judge Barksdale, and I think that has caused some confusion, and I think that's caused both by the pleading and even more so in the appellant's brief where they lump all these people together and they treat all appellants as if everything is the same to all of them. And certainly from Wells Fargo's perspective, there are some significant differences. The first, Judge Jolly, I think you alluded to, 10 of the plaintiffs did not apply for loans from Wells Fargo. An applicant is defined under the statute as any person who applies for credit directly or applies to a creditor directly for an extension of credit. Ten of the plaintiffs did not apply directly for credit from Wells Fargo. Two did, Baylor and Kennerly. ECOA creates a cause of action for an aggrieved applicant. If those 10 are not applicants, as to Wells Fargo, it's our position that they don't have a case against Wells Fargo. I want to turn now to the different groups of plaintiffs from Wells Fargo's perspective that have been alleged. And I think this first group makes it obvious why lumping all of them together doesn't work, particularly as to Wells Fargo. Four of the plaintiffs stipulated to the dismissal of their claims against Wells Fargo. That's Alexis Baines, Henry, and Jones. And two of the plaintiffs, Binnings and Haygood, all six of those alleged identical allegations in the complaint. The same thing for all of them. None of those six, the four that stipulated to dismissal, and Binnings and Haygood, alleged any connection to Wells Fargo whatsoever. There's no allegation that would tie them to Wells Fargo in any manner. And I'll distinguish those six from the other four that inquired about loans from Ameripro. Those other four said that their loans were processed using Wells Fargo's seller guideline. Six of them didn't even make that allegation. But even if they had, I want to explain next why that allegation isn't sufficient for those four to have stated a claim against Wells Fargo. So four of them, and in our brief we called them the correspondent appellants, I think, or plaintiffs. I don't recall the correspondence. They alleged that they applied for loans from Ameripro, that Ameripro intended to sell those loans to Wells Fargo, and that Wells Fargo processed their loans using Wells Fargo's seller guide. They didn't allege that Wells Fargo actually purchased any of those loans or was an assignee to any of those loans. But I want to explain why that allegation is insufficient as to Wells Fargo. First, the seller guidelines are, as alleged in the complaint, don't relate to those plaintiffs' applications for loans from Ameripro. As alleged in the complaint, and this is clear in paragraph 76, 77, and 78, I believe, in paragraph 76, plaintiffs allege, Wells Fargo set up guidelines to purchase closed loans. The guidelines relate to a transaction in the secondary market where one financial institution is dealing with another financial institution to purchase a closed loan. They alleged in paragraph 77 that the guidelines were used by creditors such as Ameripro to sell closed loans to Wells Fargo. There is nothing as alleged in the policy, and they're called seller guide. There's nothing alleged that would suggest that the seller guide relates to how anyone would process an application for credit. And so as to those four that did allege their loans were processed using that, there's nothing about those guides that relates to their request for credit, if they applied, from Ameripro. Those correspondents applied for loans from Ameripro. They are not applicants as to Wells Fargo. And so the guidelines simply don't address the transaction that is at issue for those four plaintiffs. The last group, there's four groups. The last group is Baylor and Kennerly. Those two did allege that they applied for credit from Wells Fargo. As to those two, the allegations, in critical respects, amount to nothing more than a threadbare recital of an element of a cause of action. And what I'm thinking about there is they say public assistance income was not considered on the same basis as their other income. That's simply a recitation of what the statute prohibits. They didn't plead facts to show that in their circumstances the bank discriminated against them on that basis. And I think turning a little bit to how Swierkiewicz applies in this case, Swierkiewicz is good law for the proposition that a plaintiff doesn't have to plead a prima facie case. But we have cited and Ameripro has cited a number of cases that say the prima facie case or the direct evidence method of proof both inform the question whether a plaintiff has pled sufficient plausible facts to state a claim under Twombly and Iqbal. And it was entirely appropriate for the district court to look at the elements of a prima facie case or to look at what would consist of direct evidence to test the complaint for plausibility. And that's exactly what the court did. If you go through their opinion, he has a section on prima facie case and he analyzes the allegations through that lens. Then he has a section on direct evidence and he analyzes the case through that lens. I don't think, to speak to the attorney for the CFPB, I don't think he required hostility. I think he was merely trying to define what distinguishes direct evidence from circumstantial evidence. And so it was appropriate to look at the allegations through those lenses to test whether they stated a plausible claim and we believe he correctly concluded they do not state a plausible claim. I want to address one comment from counsel for plaintiff. He suggested, and Judge Barksdale, you commented on this, that it was enough to state a minimal, a bare bones, threadbare thing and hope that discovery might lead to something that supports your claim. And in Swierkiewicz, the court talked about that. And I do think that Swierkiewicz, as Judge Dolly, to your point, is a case that set apart pleading a prima facie case from a direct evidence case. And it's important to take that court's admonition that pleading a prima facie case wasn't necessary in that context. And in that context, what the court said is it would be incongruous to require a plaintiff to plead facts that they wouldn't necessarily have to prove at trial to prevail. And they wouldn't have to prove a prima facie case if they had direct evidence of discrimination. And that's why it's not necessary to do that because he may have direct evidence. And what the Swierkiewicz court said about that that I think the Twombly court pushed back on is they said that the heightened pleading standard that the Second Circuit had applied without direct evidence of discrimination at the time of this complaint, they rejected the argument that you must plead a prima facie case of discrimination even though discovery might uncover such direct evidence. That was Swierkiewicz. And so they said that. And in its discussion in Twombly of the Conley v. Gibson no set of facts standard, I think the Twombly court said that's not good enough. And Twombly described one characterization of Conley's no set of facts standard as pleading simply a wholly conclusory statement of the claim that would survive a motion to dismiss wherever the pleadings left open the possibility that you might discover something later on. And Twombly said that was not good enough. And it specifically rejected the approach that the court of appeals in that case took where the court of appeals said the prospect of unearthing direct evidence of a conspiracy sufficient to preclude dismissal was enough even though the complaint didn't allege any single fact in the context that suggested an agreement. In that case it was agreement to conspire a horizontal conspiracy under the antitrust statutes. And so I think Twombly says it's not sufficient, I think as I heard counsel argue, to plead a bare bones complaint with the prospect that discovery may subsequently lead to the discovery of some kind of issue later on. Counsel for the appellants also suggested that the complaint alleges that all of the plaintiffs were subject to the same policy. The complaint doesn't allege that. The complaint doesn't allege as to six of the persons who approached Ameripro, those that stipulated to the dismissal, Binnings and Haygood. It doesn't allege anything about that policy. Okay. Is there any evidence, and this may be a better question for the other side, but is there any evidence that a specific loan was denied on the basis of the fact that a person included Section 8 income in the application for the loan? I don't think there's an allegation that supports that that is not conclusive. Well, if there is an individual who did it, who did it? Which one of these individuals actually applied alleged Section 8 loan, Section 8 income, and was denied a loan? The two appellants that applied directly to Wells Fargo, Baylor and Kennerly, they alleged that, and this is Baylor, and I'm looking at paragraph 96, Plaintiff Baylor's Section 8 and other public assistance income was not considered by Wells Fargo on the same basis as non-public assistance income for his mortgage application. What is that? What does he mean on the same basis as other? What is the basis that they're referring to? I don't know. What is the discrimination? On the same basis, does that mean that they treated it differently or better, or what does it mean? I think that's the problem is it's a conclusory allegation, and so as to those two, I would say they've merely stated a conclusion that is a reflection of the statement of an element of the cause of action. So what they're alleging for animus on the basis of applicants who were Title 8 voucher recipients is that they were discouraged from putting it on the application, and secondly, that there was an allegation that Wells Fargo did not accept loans based upon Section 8 income vouchers. Is that about it? That is discrimination if they say that. They're alleging you discriminate in your loan policies on the basis of Section 8 if they say that Wells Fargo does not process those loans. I don't believe that they're alleging discrimination under ACOE, Your Honor, and let me explain. To evaluate whether, and if I can back up one step, Your Honor, I don't know anywhere in the complaint where they allege that an applicant was discouraged. I don't think they allege that claim in their complaint, but to turn to Wells Fargo's policy specifically, to evaluate whether that policy was a discriminatory policy under ACOE, you need to evaluate it in terms of the specific well-pleaded facts that these different plaintiff groups alleged, and you have to evaluate it in terms of the language of ACOE. And Wells Fargo's policy concerned a transaction between two financial institutions in a secondary market to purchase closed loans. ACOE is directed to the transaction between a borrower and a creditor in the first instance. My time is up. I appreciate it, Your Honor. Yes, sir. Thank you, Mr. Lewis. Mr. Armagro, we'll hear from you. Thank you. To answer your question, Your Honor, we did specifically allege, a number of them did specifically allege, and for example, Tina Alexander's... But how do you prove your case? I mean, how do you allege your case? You say, okay, my client was an applicant and alleged Section 8 income, and he or she was denied a loan. Well, how do we know that that was the reason that it was denied without any other facts about whether the person had a good credit rating or anything else? I mean, do you have to allege that? Well, I don't know how we could. There's no basis for discrimination. I don't know how we could. I mean, we have the policy. We know what they were told. We know they were told that pursuant to this policy, that basically Ameripro intended to use Wells Fargo's selling guide, and four of them did specifically allege that they were going through that system and that they were told they could not use their Section 8. Now, at some point... That's your evidence, right? That is your evidence of discrimination, and none other, as I understand it. Is that correct? That's essentially it with respect to those four, yes, Your Honor. And we do have, and I'd be remiss if I didn't mention, we do have a policy. You're relying on their discouragement, and you're relying on a policy of Wells Fargo, and none of this really fits into the statute itself that makes it a specific, that requires specific intent to discriminate when you can show no evidence of discrimination. Oh, I think it does fit in the statute because the statute... I mean, just because they are denied a loan because they have these policies doesn't mean that that was the reason they were denied a loan, does it? Well, I think at some point common sense has to take over. For example, if you have a $500 a month mortgage assistance, you are being given $500 a month from the government. That is your public assistance. And if Ameripro and Wells Fargo, as has been alleged here, at least with respect to four, actually six, then common sense tells you when I don't get credit for $500, I am going to suffer a loss. How do they know they didn't get credit for $500? Well, number one, they were told that, as I've alleged. I mean, Tina Alexander says, you know, when Alexander was told that her section income would not qualify on her mortgage application... Well, it may not, but it doesn't because it's not Section 8. By whom was Tina Alexander told that? Which entity? I believe it was... Please don't say I believe. Which entity told her that this was why she wasn't given this loan? Ameripro. That was the entity, to answer your question, Your Honor. And that's the one that applied the Wells Fargo Selling Guide, because what happens is Ameripro uses Wells Fargo Selling Guide because Ameripro is going to turn around, originate the loan, and within 24 hours ship and sell that paper to Wells Fargo. Do you accept that ECOA does not have application to the secondary market that they're talking about when Ameripro makes the loan? There may be something else, but that ECOA is not written in terms that would prevent Wells Fargo from saying we won't buy, you know where I'm headed, but let me complete the sentence, won't buy loans with that sort of income supporting them? I do not accept that. And, in fact, the Miller v. Countrywide case specifically applies to that correspondent lending program. And the statute itself talks about, I think, the definition of creditor. And I'll go back to the actual statute, which says it is unlawful for any creditor to discriminate with respect to any aspect of the credit transaction with respect to an applicant. And they define creditor as anyone who participates in the loan decision. Not just the originating bank, but anyone who participates in the loan decision. Is this a regulation of the Bureau or whatever the short form is? I believe it's either in the regulation, and now I'm forgetting whether it's in the statute or the regulation or both, but I know it's in the regulation. I know it's cited in the brief that anybody who participates in the decision is considered a creditor. And it's also in the Miller v. Countrywide case. And so they involve themselves in the or participate in the crime by simply having that policy. Even though they had no relation whatsoever with that particular borrower, by virtue of the policy, they participated in the denial of that loan. Is that your argument? Yes, although we don't know. We don't believe they had communications directly with the borrower with respect to everybody besides Baylor. They had no direct participation whatsoever with the borrower? No, Your Honor. And you're saying that they participated in it because they had a policy with respect to secondary mortgages that they discriminated against? That's correct. We're setting aside the two direct applicants, Baylor and Kennerly. But yes, Your Honor, that is what we're saying. Because they set a policy for their correspondent lenders, such as Ameripro to use, which violates on its face the statute. And I'll conclude with we have alleged that our clients were on Section 8. We have, with respect to all the evidence we could get from our clients, we alleged all we absolutely could. And believe me, Your Honor, if we could have alleged more in good faith, if we had a good faith basis for alleging more, we would have. I understand that, but I mean that's the problem. Well, but except that, Your Honor, I think with respect to at least the four, and I think with respect to all of them actually, but with respect to at least the four, they have very specifically alleged that they went to the creditor, asked for a loan, mentioned their Section 8, and were told that their Section 8 would not apply. And as a result, they did not get the loans that they had asked for. You allege that specifically? We allege that. Now, I don't know how anybody could say. I mean, we don't know who walks into the bank that's not on public assistance. We can't give you a name of somebody that walked into the bank without public assistance and got the same loan that they wanted. That would be impossible to do that without discovery. But I think we can say common sense has to take over. And common sense, I believe, is cited by the Supreme Court as one of the guiding principles. Well, they say there's a reason they call it common. Well, but I think common sense tells us when you don't get the assistance of a $30,000 down payment voucher and a $500 or $300 per month housing assistance, common sense is telling you that you're not being treated the same. Common sense is telling you you're being damaged. I will conclude that, Your Honor. Thank you. Okay. Thank you very much, Mr. Smart. That completes the cases that we have on the oral argument calendar for today. So this panel stands in recess until tomorrow morning at 9 o'clock.